UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ELISSA LeBOY | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  14 C 3287 |
| | ) | |
| MEGAN J. BRENNAN, Postmaster | ) | Judge Rebecca R. Pallmeyer |
| General of the United States | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

After months of what she alleges was a campaign of harassment on the basis of her sex and disability, Plaintiff Elissa LeBoy was fired from her job as a mail carrier with the United States Postal Service ("USPS") in 2006.  Years passed while she unsuccessfully pursued her claims before the Equal Employment Opportunity Commission ("EEOC"), through two appeals and a motion to reconsider the agency's decision in the USPS's favor; those proceedings terminated in 2014.  LeBoy filed this action shortly thereafter in May 2014, alleging disparate treatment and a hostile work environment based on sex and perceived mental disability in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, the Civil Rights Act of 1991, 42 U.S.C. § 1981 *et seq.*, the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.*, and 42 U.S.C. § 1983.  Defendant now seeks summary judgment.  For the reasons set forth below, Defendant's motion is granted in part and denied in part.

## BACKGROUND

The court views the record in the light most favorable to the party opposing a motion for summary judgment, here, LeBoy.  *Dawson v. Brown*, 803 F.3d 829, 832 (7th Cir. 2015).

Elissa LeBoy was employed by the United States Postal Service ("USPS") at its Palatine, Illinois facility from March 6, 2004 through March 9, 2006.  (Plaintiff's Local Rule 56.1(b)(3)(C) Statement of Additional Facts [hereinafter "Pl.'s SOF"] [52], at ¶¶ 1–2.)  During

that two-year period, LeBoy contends, her supervisors harassed and mistreated her in a variety of ways. The parties have not described her job responsibilities, but LeBoy had the title of Part Time Flexible City Carrier. (*Id.* ¶ 2.) Dennis Arneson was LeBoy's direct supervisor until he was replaced by Mark Hurter in September 2004. (*Id.* ¶ 3.) The record does not disclose Hurter's precise job title, nor his position in the facility's management hierarchy. (*See id.*)

Richard Cullerton was the postmaster in Palatine during the relevant period until November 25, 2005. (*Id.*) Cullerton was replaced by Officer-in-Charge Michael Naranjo on November 28, 2005. (*Id.*) (The court presumes that an Officer-in-Charge and a Postmaster have the same responsibilities.) Fred Johnson was a supervisor of customer service (*id.*), who also had some supervisory authority over LeBoy that the parties do not further explain. (*See id.* at ¶ 34.) Neither party has identified any other level of management, so the court presumes that Johnson and Hurter reported directly to Cullerton until late 2005, and to Naranjo after that date.

A hostile work environment claim is timely as long as "*any* act falls within the statutory time period," even if the charge includes events occurring before the statutory cut-off. *Adams v. City of Indianapolis*, 742 F.3d 720, 730 (7th Cir. 2014) (quoting *National R.R. Passenger Corp v. Morgan*, 536 U.S. 101, 120 (2002)). As described further below, LeBoy timely contacted an EEO counselor within 45 days after she was fired in 2006, preserving her hostile work environment and discriminatory firing claims. For reasons the parties do not fully explain, her complaint remained pending with the EEOC for more than seven years until her final agency appeal was denied on January 30, 2014. *See LeBoy v. Donahoe*, Request No. 0520130501, Ex. 1 to Compl. [1 at p. 8], slip op. at 3 (U.S. Equal Emp't Opportunity Comm'n Jan. 30, 2014). Accordingly, the events described below, though not independently actionable, are relevant to the court's determination on summary judgment.

Specifically, LeBoy describes numerous incidents of what she believes to be unwarranted discipline and humiliating comments made by Hurter, Johnson, and, later in her tenure, Naranjo, spanning nearly her entire two years with the USPS. She claims that these events created a hostile work environment and culminated in her firing because of sex or perceived disability. The court considers each below.

## I.    Fall 2004-Winter 2005

Even before Hurter became LeBoy's direct supervisor in August 2004, LeBoy alleges that he started calling her "Coco," which eventually transformed into the pejorative "Coo Coo." (Pl.'s SOF ¶ 4.) When LeBoy asked him to stop doing this, Hurter explained that he used the nickname because LeBoy's name reminded him of a 1970s-era baseball player for the Montreal Expos, José Alberto "Coco" Laboy. (Postal Service's Local Rule 56.1 Statement of Facts [hereinafter "Def.'s SOF"] [48], at ¶ 74); *see also Coco Laboy*, Soc'y for Am. Baseball Research (last visited Jul. 5, 2017), https://sabr.org/bioproj/person/909eaf85. Hurter evidently did not stop—LeBoy alleges that by December 2004, "the work environment became extremely hostile due to this continuing name calling." (Pl.'s SOF ¶ 4.) Her relationship with Hurter deteriorated further after Hurter announced to the entire work floor in early December that LeBoy was not scheduled to work on Christmas Day; evidently, many others were. (*Id.* ¶ 5.) After she explained to him that she needed the day off to go to her girlfriend's family's home for Christmas dinner, Hurter asked LeBoy if she was dating a woman. (*Id.*) LeBoy confirmed that she was (Admin. Hearing Tr., Ex. D. to Pl.'s SOF [54], at 3582:22–83:9), and felt this contributed to Hurter's eventually singling LeBoy out for discipline and harassment. (*Id.* at 3584:23–85:13.)

The situation boiled over shortly before Christmas. On December 21, 2004, LeBoy felt ill and asked to leave work early. (Pl.'s SOF ¶ 6.) Hurter approved, but as LeBoy was leaving, another supervisor, Sheila Broadway, told LeBoy that the schedule had changed and that

LeBoy was now scheduled to work on Christmas Day. (*Id.* ¶ 6.) LeBoy sought Hurter out and protested that he had promised she would have that day off. (*Id.*) Hurter pointed out to LeBoy that she was a Part Time Flexible carrier, which meant that her schedule was subject to change. (Def.'s SOF ¶ 3). LeBoy does not apparently dispute this, but complains that Hurter then announced, "You're working and there's nothing you can do about it." (Pl.'s Resp. to Def.'s SOF ¶ 3.) LeBoy appears to believe that Hurter's tone was hostile. The argument escalated, with LeBoy and Hunter "in each other's faces," in LeBoy's characterization, when LeBoy accused Hunter of rescheduling her in retaliation for being sick that day. (Def.'s SOF ¶ 4; Pl.'s Resp. to Def.'s SOF ¶ 4.)

LeBoy alleges that Hurter backed LeBoy into a set of doors on the workroom floor, pounded his fist against the door, and screamed at her. (Pl.'s Resp. to Def.'s SOF ¶ 4.) The parties agree that Hurter told LeBoy to leave the building, and that LeBoy called Hurter an "asshole." (Def.'s SOF ¶ 5–6.) Defendant claims that LeBoy told Hurter that she would "kick his ass" (Def.'s SOF ¶ 6); LeBoy admits only that she told a fellow employee, Marty Mia, that "if I were a guy, I would kick his ass." (Pl.'s Resp. to Def.'s SOF ¶ 6.) The police were called (by whom and when, the parties do not say), but neither Hurter nor LeBoy was arrested. (*See* Def.'s SOF ¶ 6.) LeBoy left the building voluntarily. (*See id.*) Hurter sent LeBoy a letter the same day, placing her in "off-duty status" on an "emergency" basis; that is, he immediately suspended LeBoy indefinitely without pay. (*See* Def.'s SOF ¶ 1; Letter from Mark Hurter to Elissa LeBoy, "Emergency Placement in an Off-Duty Status" (Dec. 21, 2014), Ex. 2 to Def.'s SOF [48-1 at p. 3].)

Hurter followed the suspension with a formal Notice of Removal, the Postal Service's method for initiating a termination, on December 28, 2004. (Letter from Mark Hurter to Elissa LeBoy, "Notice of Removal" (Dec. 28, 2004), Ex. 3 to Def.'s SOF [48-1 at p. 5].) LeBoy filed a

union grievance, and a union representative negotiated with management to reduce the removal to a 14-day "paper suspension," which the parties entered into in January 2005.  (Settlement Agreement Between Richard Cullerton, Postmaster & Carl F. Oefelein, Nat'l Ass'n of Letter Carriers (Jan. 12, 2005), Ex. 6 to Def.'s SOF [48-1 at p. 18].)  The parties' submissions do not explain what a paper suspension is, nor do they say whether LeBoy was at work or suspended between December 21 and the resolution on January 12.

LeBoy filed an EEO complaint against Hurter regarding this incident, alleging that he discriminated against her.  (*See* Def.'s SOF ¶ 8.)  The parties did not produce the original document and what exactly LeBoy alleged there is unknown.  The USPS is required by law to maintain its own EEO unit, where employees can file discrimination complaints based on federal civil rights laws.  42 U.S.C. § 2000e-16; USPS, PUBLICATION 133 – WHAT YOU NEED TO KNOW ABOUT EEO 4–5 (2012), *available at* https://about.usps.com/publications/pub133.pdf.  To initiate the process, a person who claims discrimination must meet with a counselor and submit a complaint to the EEO within 45 days of the incident, 29 C.F.R. § 1614.105(a)(1), which in the Post Office requires filing an "Information for Pre-Complaint Counseling,"  *see* PUBLICATION 133 at 6.  The counselor attempts to informally resolve the situation through "counseling,"[1] but if that effort is unsuccessful, the aggrieved person may file a formal complaint with the EEOC.  29 C.F.R. § 1614.105(d).  If the person who has allegedly suffered discrimination does not file a complaint, the EEOC dismisses the matter.  *See* 29 C.F.R. § 1614.107(a)(2).  If a formal complaint is filed, the EEOC will investigate.  29 C.F.R. § 1614.106(e)(2).  Absent a settlement, the matter proceeds to a hearing before an administrative judge, who hears testimony from witnesses under oath and issues a decision.  29 C.F.R. § 1614.109.  The EEOC then issues a "final action" on the complaint, which notifies the complainant of her right to appeal within the

---

[1]     Counselors are directed to "conduct counseling activities in accordance with instructions contained in Commission Management Directives."  29 C.F.R. § 1614.105(c).

EEOC if she has not prevailed, or to file a civil action in federal district court, along with the time limits for filing. 29 C.F.R. § 1614.110(a).

The parties do not say whether LeBoy made it past the "Information for Pre-Complaint Counseling" stage to filing a formal complaint; the parties' submissions say only that she "did not pursue" this action. The court concludes that she did not file a complaint, as only an Information would result in dismissal for lack of pursuit by the party. *See* 29 C.F.R. § 1614.107(a)(2). LeBoy concedes that she dropped the matter, and explains that she feared that Fred Johnson would use any statements she made in connection with the EEOC proceedings against her in the future. (Pl.'s Resp. to Def.'s SOF ¶ 8.) As this is LeBoy's first mention of Johnson in the chronology, the exact predicate for this concern is unclear.

LeBoy complains about a host of incidents over the next several months that, she believes, reflect bias. For example, LeBoy claims that she was unfairly subject to suspension in February 2005 for failure to deliver Express Mail by the noon deadline. (Pl.'s Resp. to Def.'s SOF ¶¶ 9–10.) LeBoy asserts that the intended recipient had moved by the time she arrived to deliver the mail. (*Id.* ¶ 9.) In a post-suspension letter, the new resident at the address confirmed that LeBoy did attempt a timely delivery. (Letter from Rose Benjamin (Feb. 17, 2005), Ex. R to Pl.'s SOF [54 at p. 46].)

Just a few months after that, in May 2005, Johnson attempted to fire her again for "conduct unbecoming a postal employee," stemming from an incident on April 14 in which LeBoy arrived less than five minutes late from completing her route. (Def.'s SOF ¶¶ 12–13; Pl.'s Resp. to Def.'s SOF ¶ 13 (arguing that she was two minutes late).) When Sheila Broadway asked her why she was late, a confrontation ensued between LeBoy, Broadway, and Johnson, who had entered the scene at some point. (Pl.'s Resp. to Def.'s SOF ¶¶ 14–15.) LeBoy claims that Broadway was "haranguing her," and that LeBoy responded by accusing Broadway of being

6

a "lousy carrier and supervisor" and by pointing out that Johnson had three DUIs and his drivers' license had been revoked.  (*Id.*)[2]

Johnson waited nearly a month before issuing LeBoy a Notice of Removal for this incident on May 6.  (Def.'s SOF ¶ 7.)  LeBoy promptly filed a grievance, which was successful in that the punishment was reduced by the USPS's Dispute Resolution Team ("DRT").  (Def.'s SOF ¶ 7.)  A DRT is a group of USPS employees and union officials—who do not know the parties involved in the dispute—that reviews the matter and renders a decision.  (Def.'s SOF ¶ 7; Dispute Resolution Team, Step B Decision (June 13, 2005), Ex. 12 to Def.'s SOF [48-1 at p. 74].)  In a decision dated June 13, the DRT converted LeBoy's termination to a 14-day suspension "without loss of pay or time off."   The DRT found LeBoy's conduct inappropriate, but also observed that management "had prodded an employee that is known to 'go off,'" which the DRT decided was a mitigating factor in LeBoy's behavior.  (*See* DRT, Step B Decision at USPS454; *see also* Def.'s SOF ¶ 18.)  Though the suspension was applied "without time off," the parties do not address whether LeBoy remained at work while the DRT process was pending.

Both parties note that LeBoy filed another "complaint" with the EEO after this incident— which the court presumes was an Information for Counseling—on May 10, 2005, while the grievance was pending.  (Pl.'s Resp. to Def.'s SOF ¶ 19.)  This complaint charges that Johnson called LeBoy "worthless" on several occasions beginning in January of that year (*id.*), but the original is not in the record and LeBoy has not identified the protected-class basis for this

---

[2]     LeBoy was so upset by the altercation that she called in sick the follow day. (Pl.'s SOF ¶ 25.)  Postmaster Cullerton sent her a letter on April 15 detailing the procedures for verifying a "mental or nervous condition[]"  (Letter from Richard Cullerton to Elissa LeBoy (Apr. 15, 2005), Ex. T to Pl.'s SOF [54 at p. 53]), which LeBoy presents as evidence that USPS supervisors believed she had a disability.  (Pl.'s Resp. Mem. in Opp. to Def.'s Mot. for Summ. J. [50], at 4.)

complaint. She did not file a formal complaint after the initial Information, so this matter, too, was terminated by the EEOC. (Def.'s SOF ¶ 20.)

Yet another incident occurred on June 1, 2005, leading to another Notice of Removal. (*Id.* ¶ 21.) LeBoy reported 15 minutes late to work and immediately asked to see a union steward to request a retroactive change of schedule—presumably, so she would not be charged with tardiness for the day—but Broadway refused her request. (Pl.'s Resp. to Def.'s SOF ¶¶ 22–23.) LeBoy then discovered that she would not be authorized to work a full eight-hour day because some of her work had already been completed, and again asked to see a union steward. (Def.'s SOF ¶¶ 25–26; Pl.'s Resp. to Def.'s SOF ¶¶ 25–26.) Again, Broadway refused and ordered LeBoy back to her work area. (Def.'s SOF ¶ 27; Pl.'s Resp. to Def.'s SOF ¶ 27.)[3] After further exchanges, Broadway claims that LeBoy looked at her "in a threatening manner," which caused Broadway to order LeBoy to leave the premises—effectively placing her, again, immediately in unpaid, "off-duty" status. (Def.'s SOF ¶ 28; Letter from Fred Johnson to Elissa LeBoy, Emergency Placement in an Off-Duty Status (Jun. 2, 2005), Ex. 14 to Def.'s SOF [48-1 at p. 80].) Fred Johnson penned both the formal off-duty status letter and, a month later, the Notice of Removal. (Letter from Fred Johnson to Elissa LeBoy (Jul. 7, 2005), Ex. 13 to Def.'s SOF [48-1 at p. 77].) Both the off-duty decision and the removal were reversed by a DRT after LeBoy promptly grieved the decisions within a day of their issuance. (*See* Pl.'s SOF ¶ 31.) LeBoy was off-duty without pay from June 1, 2005 until that decision was reversed on July 20, 2005 (Dispute Resolution Team, Step B Decision (Jul. 20, 2005), Ex. 17 to Def.'s SOF [48-1 at p. 86], at USPS504), and the removal was reduced to a 21-day suspension, time LeBoy was

---

[3] LeBoy asserts that the union contract entitled her sufficient work for an eight-hour day (Pl.'s Resp. to Def.'s SOF ¶ 26); Defendant does not address whether this assertion is reasonable considering her status as a part-time, flexible carrier.

deemed to have served during her off-duty status.  (Dispute Resolution Team, Step B Decision (Aug. 25, 2005), Ex. 18 to Def.'s SOF [48-1 at p. 89], at USPS534.)

In September 2005, LeBoy filed another Information complaining that Johnson, in a derogatory tone, made hostile comments to her, such as "Lady you're not worth a damn thing," "Lady, you can't do anything," and "Lady, what don't you understand."  (Def.'s SOF ¶ 38.)  This matter, too, was closed after thirty days because LeBoy did not file a formal complaint.  (Pl.'s Resp. to Def.'s SOF ¶ 40.)  LeBoy claims she was prevented from doing so by an on-the-job injury: on September 10, 2005, she suffered a pelvic muscle injury while lifting a heavy mail bag up the stairs which kept her out of work until October.  (Pl.'s SOF ¶ 10; Pl.'s Resp. to Def.'s SOF ¶ 40; *see also* Letter from Dr. Albert Olorvida (Nov. 29, 2005), Ex. H to Pl.'s SOF [54 at p. 14].)  LeBoy alleges that Johnson interfered with her receiving pay for the time she was out of work by contesting the fact of her injury to the Injury Compensation Department, the office in charge of determining work-related injury pay, and by ultimately firing her before the issue could be resolved.  (Pl.'s SOF ¶ 35.)

## II.    Hurter and Naranjo's Comments

The date that LeBoy returned to work is not clear in the record, but she was apparently back on the job by the end of October.  The morning of October 27, LeBoy reported that she was unable to come to work due to pain, explaining to Mark Hurter over the phone in confidence that her menstrual period was aggravating her existing pelvic injury.  (Pl.'s SOF ¶ 11.)  LeBoy claims that afternoon, Carl Oefelein, the union steward, and another letter carrier, Karla Reinke, called her to tell her that Hurter had announced to her coworkers that LeBoy could not work because of her period.  (*Id.*)  LeBoy remained off work through October 31, 2005, and claims that while she was out, unidentified coworkers called her to let her know that when other female workers called in sick, Hurter would comment that "She's pulling a CoCo" and "can't work

because of her period." (*Id.*)  Several other employees corroborated in unsworn statements that they saw and heard Hurter mocking LeBoy by saying that she called in sick due to her period and by grabbing his crotch.  (Pl.'s SOF ¶¶ 11–16.)[4]

In October 2005, LeBoy renewed her September 2005 EEO claim, alleging that Johnson was referring to her as "lady" in a derogatory way, and added that Hurter was making demeaning references to her menstrual cycle.  (Def.'s SOF ¶¶ 41–42.)  LeBoy did not file a formal complaint, however, which she again explains was due to pain from her injury and that she was focused on getting back to work.  (Pl.'s Resp. to Def.'s SOF ¶ 43.)

Shortly afterward, Johnson issued yet another Notice of Removal to LeBoy for allegedly failing to follow instructions between August 29, 2005 and September 3, 2005.  (Def.'s SOF ¶ 34; Pl.'s Resp. to Def.'s SOF ¶ 34.)  This Notice of Removal, issued on November 5, 2005, charged LeBoy with reporting late to work, failing to notify supervisors that she would be late returning from her route, deviating from work assignments, wearing headphones on her route, and walking off her route during those dates.  (Def.'s SOF ¶ 35.)  LeBoy again sought DRT review, and again the DRT reversed the notice, finding that Johnson issued the notice too long after the incidents for the union to adequately defend against the charges.  (*Id.* ¶ 36.)  The DRT did not find make any findings on the merits of the charges.  (*Id.* ¶ 37.)

In December 2005, LeBoy again filed an Information with the EEO, claiming that Johnson continued to refer to her as "lady" in a derogatory way, and that he had refused to

---

[4]      Defendant argues that these facts are inadmissible, as they are supported only by unsworn statements.  Whether an unsworn statement is enough to defeat a summary judgment motion is "an open question in this circuit . . . ."  *Olson v. Morgan*, 750 F.3d 708, 714 (7th Cir. 2014) (citing *Jajeh v. County of Cook*, 678 F.3d 560, 568 & n.4 (7th Cir. 2012)).  The Seventh Circuit has noted, however, that the "Federal Rules of Civil Procedure allow parties to oppose summary judgment with materials that would be inadmissible at trial so long as facts therein could later be presented in an admissible form."  *Id.* (citing Fed. R. Civ. P. 56(c)(2)–(4)).  Plaintiff's failure to obtain sworn statements from her co-workers is disappointing, but the court will assume for purposes of this motion that the witnesses would, if asked, swear to their statements.

authorize her pay while she was out of work due to her pelvic muscle injury. (Def.'s SOF ¶¶ 44–45.) The EEO again closed the matter because LeBoy did not file a formal complaint. (Pl.'s Resp. to Def.'s SOF ¶ 50.)

LeBoy called in sick on December 10, 2005 due to stomach flu. (Pl.'s SOF ¶ 27.) When she returned, she found a box of anti-diarrheal medication in her work area labeled "For Elissa LeBoy." (*Id.*) She believes it was Hurter who left it there, noting that he later "paraded around the work floor in the unit with the box, smirking and laughing." (*Id.*) Defendant asserts that LeBoy cannot prove that it was Hurter who left the box (Def.'s Resp. to Pl.'s SOF [60], at ¶ 27), but do not produce a denial by Hurter, via affidavit or deposition.

Michael Naranjo became the Officer-in-Charge of the Palatine facility after Richard Cullerton left his position as Postmaster in November 2005. (Pl.'s SOF ¶ 3.) On December 24, 2005, Naranjo criticized another carrier, Steven O'Connell, by asking him—according to LeBoy and O'Connell—"why he could not carry the route as good [sic] as an old woman" (*id.*), or, according to Naranjo himself, "You mean that you can't do the route as fast as an older woman?" (Grievance Summary, USPS (Jan. 6, 2006), Ex. O to Pl.'s SOF [54 at p. 36].) O'Connell filed a grievance regarding this statement, and Carl Oefelein provided an unsworn statement that at the hearing, Naranjo refused to apologize. (Statement of Carl Oefelein, Ex. O to Pl.'s SOF [54 at p. 37].) Instead, Oefelein recounted, Naranjo announced his view that men are the "dominating sex" and that women cannot do the job as well as men because women are weaker. (*Id.*) LeBoy does not claim to have personally witnessed either of Naranjo's statements. (*See* Pl.'s SOF ¶ 17.)

LeBoy also claims that Mark Hurter ridiculed her for a perceived mental disability. In addition to LeBoy's allegations that Hurter called her "Coo Coo," Aaron Syrdahl told an EEO investigator in December 2007 (nearly a year and a half after LeBoy's termination) that he heard

Hurter describing LeBoy as "whacked" and "nuts." (*Id.* ¶ 19.) LeBoy also asserts that Hurter asked her at some point in 2005 whether she had Attention Deficit Disorder or "some kind of mental issue." (*Id.* ¶ 26.) LeBoy described other incidents with Hurter, supposedly supported by her and other employees' testimony at the EEO hearing in this case, but did not produce the portions of testimony cited. (*See id.* ¶¶ 20, 23, 24.)

### III.    Final Notice of Removal

On January 21, 2006, supervisors directed the mail carriers in the Palatine post office, including LeBoy, to clear their work stations using their carts as temporary storage so the work room floor could be redesigned. (Def.'s SOF ¶ 55.) Out of seventy-nine employees in the office that day, only LeBoy did not follow those instructions. (*Id.* ¶ 56.) LeBoy explained that she could not comply: she claims that after loading her mail truck, she was unable to get back into the building with her cart because a wall of heavy metal cases, office equipment, and hampers blocked the back door. (Pl.'s Resp. to Def.'s SOF ¶ 56.) LeBoy reports that she called out for a manager, but none were nearby. (*Id.*) Defendant contends that Naranjo had personally cleared the back door, and that he and seven other supervisors were in the area at the time LeBoy supposedly called out for assistance, but that no one heard her. (Def.'s SOF ¶ 65.)

LeBoy also says she called the facility later that day and spoke with another supervisor, Lisa Harris, who said "it was 'OK'" that LeBoy had failed to prepare her workstation. (Pl.'s Resp. to Def.'s SOF ¶ 56.) Harris, in an affidavit submitted to the EEOC nearly two years later, stated that she did not recall giving LeBoy approval not to follow the instruction, and added that LeBoy should have gotten in touch with her own supervisor, not Harris. (EEO Investigative Aff. of Lisa M. Harris (Mar. 12, 2008), Ex. 28 to Def.'s SOF [48-1 at p. 139], at USPS338–39.)

Three days later, on January 24, 2006, LeBoy's supervisor that day,[5] Milton Cardenas, told LeBoy to deliver one set of bulk mail flyers and authorized her to work two hours of overtime. (Def.'s SOF ¶ 57.) LeBoy delivered two sets of bulk mail flyers and worked three hours of overtime. (*Id.* ¶ 58.) LeBoy explains that Cardenas told her to deliver just one of the two sets of bulk mail flyers, but that she discovered a third, so she delivered two of the three. (Pl.'s Resp. to Def.'s SOF ¶ 57.) She further explains that the route required an extra hour of work because it was new to her and the load of mail was heavy. (*Id.*) LeBoy asserted—in the DRT hearing that ultimately resulted from these incidents—that she called the facility several times, attempting to inform management that she would be late. (Dispute Resolution Team, Step B Decision (Mar. 2, 2006), Ex. 26 to Def.'s SOF [48-1].) This contradicts the statement Leboy gave in a "pre-disciplinary" interview with Cardenas and a union steward, that she did not call because she thought she could get the route done in time. (Def.'s SOF ¶ 69.)

Johnson sent LeBoy another Notice of Removal for failure to follow instructions, based on these two incidents, on February 7, 2006. (*Id.* ¶ 54.) LeBoy once again challenged the Notice, but this time the DRT concluded that LeBoy was removed for just cause. (*Id.* ¶ 71; DRT, Step B Decision (Mar. 2, 2006), Ex. 26 to Def.'s SOF [48-1 at p. 125].) LeBoy's last day was March 9, 2006. (Pl.'s SOF ¶ 2.)

## IV. Proceedings Up to This Point

LeBoy claims that other carriers were treated more favorably than she, confirming that the Post Office's actions in her case were discriminatory. LeBoy identifies seventeen other

---

[5] The exact supervisory structure in the post office continues to mystify the court. The parties do not explain whether this was a temporary appointment for Cardenas, or what led to this arrangement. LeBoy represented that Hurter was her "Acting Supervisor" after September 2004 until her firing (Pl.'s SOF ¶ 3), but how often she was supervised by others, as occurred here, is unexplained.

carriers as comparators (Pl.'s SOF ¶ 38), but only three of them are male, had similar or worse offenses, and were not terminated.[6]  They are:

| Name | Offenses | Immediate supervisor | Concurring supervisor | Treatment |
|---|---|---|---|---|
| Mike Morgan | Falsified disability claim, made false statements in an official investigation[7] | Derrick Jaegers | Michael Naranjo | Reduced to 14-day paper suspension,[8] received step pay increase Dec. 2007.[9] |
| Luis Tamez | Failure to operate vehicle in a safe manner;[10] unscheduled leaves which violated "Last Chance" agreement[11] | Jim Carlson | Michael Naranjo | Not terminated. Received contractual pay increase Nov. 2007.[12] |

---

[6]    LeBoy identifies a fourth, Martell Wilburn, but it appears that Mr. Wilburn was also terminated.  (Letter from James Carlson to Martell Wilburn, Notice of Removal (Oct. 18, 2007), Ex. EE to Pl.'s SOF [55 at p. 47], at USPS776.)  Cleophus Lesure, also identified as a comparator, was issued a Notice of Removal in 2008, and there is no evidence that he remained employed after that date.  (Letter from James Carlson to Cleophus Lesure, Notice of Removal (Jan. 8, 2008), Ex. EE to Pl.'s SOF [55 at p. 62].)  The record only shows that Lesure received a pay increase in November 2007, before the Notice of Removal.  (USPS, Notification of Personnel Action: Cleophus Lesure (Nov. 24, 2007), Ex. EE to Pl.'s SOF [55 at p. 61].)
    LeBoy also identifies two others, Dean Szczepanski and Robert Roth, who received contractual pay increases after some conduct-related discipline.  (Pl.'s SOF ¶ 38.)  The record contains no information about the underlying conduct, however (see USPS Notification of Personnel Action, Dean Szczepanski (Nov. 24, 2007), Ex. EE to Pl.'s SOF [55 at p. 11] (documenting increase only); USPS Notification of Personnel Action, Robert Roth (Nov. 24, 2007), Ex. EE to Pl.'s SOF [55 at p.112] (documenting increase only)), and they are therefore not useful comparators.
    LeBoy further identifies George Walton, but the court was unable to locate any references to Mr. Walton in the documentary record.

[7]    (Letter from Derrick Jaegers to Mike Morgan, Notice of Removal (Feb. 1, 2006), Ex. EE to Pl.'s SOF [55 at p. 30].)

[8]    (Settlement between Michael Naranjo, Officer in Charge & Carol Leslie-Parks, Union Steward, Grievance # 06-02CP, Grievant Mike Morgan (Feb. 16, 2006), Ex. EE to Pl.'s SOF [55 at p. 34].)

[9]    (USPS, Notification of Personnel Action: Mike Morgan (Dec. 22, 2007), Ex. EE to Pl.'s SOF [55 at p. 29].)

[10]    (Letter from Jim Carlson to Luis Tamez, Notice of Removal (Nov. 5, 2007), Ex. EE to Pl.'s SOF [55 at p. 54].)

[11]    (Letter to Luis Tamez, Notice of Removal (Dec. 28, 2007), Ex. EE to Pl.'s SOF [55 at p. 59].)

| Joe Swierkosz | Emergency placement in off-duty status for scanning parcels when not delivering them;[13] Notice of Removal for same conduct[14] | Alvina Williams | Fred Johnson | Not terminated. Received contractual pay increase Nov. 2007.[15] |
|---|---|---|---|---|

LeBoy filed another pre-complaint Information with an EEO counselor on March 7, 2006. (Def.'s SOF ¶ 51.)  The information alleged that Johnson and Naranjo removed her on the basis of false accusations because of her sex.  (*Id.* ¶ 52; Information for Pre-Complaint Counseling (Mar. 7, 2006), Ex. 24 to Def.'s SOF [48-1 at p. 118].)  This time, LeBoy proceeded to file a formal complaint; there, she alleged that Hurter had made "gender negative" comments about her menstrual cycle, that Johnson called her a "worthless lady," and that Johnson and Naranjo terminated her for false accusations.  (EEO Complaint of Discrimination in the Postal Service (May 17, 2006), Ex. JJ to Pl.'s SOF [56 at p. 12].)  LeBoy listed Johnson, Hurter, and Naranjo as individuals who took discriminatory actions against her based on her sex and perceived disability.  (*Id.*)  The EEO framed the charges for investigation as: "You allege discrimination based on Sex (female) and Disability (perceived mental) when 1) from October 27, 2005 you have been subject to ongoing hostile work environment harassment in that frequent humiliating and embarrassing jokes were made about your menstrual cycle; 2) on February 7, 2006 you were issued a Notice of Removal."  (USPS, Acknowledgement & Acceptance of Remanded Claim (June 23, 2006), Ex. JJ to Pl.'s SOF [56 at p. 21].)

---

[12]     (USPS, Notice of Personnel Action: Luis Tamez (Nov. 24, 2007), Ex. EE to Pl.'s SOF [55 at p. 53].)

[13]     (Letter from Alvina Williams to Joe Swierkosz, Emergency Placement in an Off-Duty Status (May 13, 2005), Ex. EE to Pl.'s SOF [55 at p. 14].)

[14]     (Letter from Alvina Williams to Joe Swierkosz, Notice of Removal (n.d.), Ex. EE to Pl.'s SOF [55 at p.16].)

[15]     (USPS, Notification of Personnel Action: Joseph Swierkosz (Nov. 24, 2007), Ex. EE to Pl.'s SOF [55 at p. 13].)

The administrative judge initially dismissed her complaint as a collateral attack on the grievance proceeding, but LeBoy appealed that decision and the EEOC remanded the case for a determination on the merits in October 2007. *LeBoy v. Potter*, Appeal Nos. 120064032 & 120071858 (U.S. Equal Emp't Opportunity Comm'n Oct. 21, 2007). The case did not proceed to hearing before an ALJ until April 2010, and on May 3, 2010, the ALJ issued a decision finding that LeBoy failed to show that the Postal Service discriminated against her on the basis of sex or perceived disability.[16] *LeBoy v. Donahoe*, Request No. 0520130501, Ex. 1 to Compl. [1 at p. 8], slip op. at 3 (U.S. Equal Emp't Opportunity Comm'n Jan. 30, 2014) [hereinafter "*Donahoe* Op."] (denying request for reconsideration); (*see also* Pl.'s Br. In Supp. of Appeal at 6, *LeBoy v. Potter*, Appeal No. 120102916, Ex. 1 to Compl. [1 at p. 20] [hereinafter Appeal Br.].) The ALJ declined to consider events before October 2005 as independently actionable events, instead considering them only as background evidence of LeBoy's supervisors' motivations in ultimately firing her, as LeBoy had abandoned all of her previous complaints before this date. *Donahoe* Op. at 3. The judge found that Hurter's calling LeBoy "Coo Coo" was not sufficient to establish that Hurter perceived that LeBoy had a disability. *Id.* Hurter's comments regarding LeBoy's menstrual cycle did establish a *prima facie* case of sexual discrimination, but the ALJ deemed those comments not sufficiently severe or pervasive to create an abusive work environment. *Id.* Finally, the ALJ determined that LeBoy's *prima facie* case of discriminatory firing was defeated by the USPS's legitimate reason for firing her. *Id.*

The EEOC issued a final order adopting the Administrative Judge's decision on June 23, 2010. (*See* Appeal Br. 6). LeBoy appealed that order in November 2010 (*see id.* at 1), and the EEOC upheld the decision, finding that even if LeBoy established *prima facie* cases of discrimination based on both sex and disability, the USPS articulated a legitimate,

---

[16]     The ALJ's original decision is not in the record; this description is taken from the EEOC's summary in its review of the decision.

nondiscriminatory reason to terminate her. *Donahoe* Op. at 4. (The date of this decision on appeal is unknown, and it does not appear in the record.) LeBoy's request for reconsideration of that decision was denied on January 30, 2014. *See id.* at 4–5.

LeBoy filed a complaint in this court on May 6, 2014 (Compl. [1]),[17] which she amended after counsel was appointed (Am. Compl. [30]), alleging unlawful employment discrimination based on her sex and perceived mental disability. (*Id.* at 1.) After discovery, Defendant moved for summary judgment [46].

## LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56. Courts deciding summary judgment motions must view facts "in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing FED. R. CIV. P. 56(c)). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party has the initial burden of establishing that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets this burden, "[t]he nonmoving party must point to specific facts showing that there is a genuine issue for trial." *Stephens v. Erickson*, 569 F.3d 779, 786 (7th Cir. 2009). Factual disputes do "not preclude summary judgment when the dispute does not involve a material fact." *Burton v. Downey*, 805 F.3d 776, 783 (7th Cir. 2015).

---

[17] The court is uncertain when LeBoy received the January 30, 2014 decision, and is uncertain whether the complaint in this court was timely filed. *See* 42 U.S.C. § 2000e–16(c) (complaint must be filed within 90 days of final agency decision). USPS did not raise any statute of limitations argument in its summary judgment brief or reply, however, so any such argument is waived. *See Witte v. Wis. Dep't of Corr.*, 434 F.3d 1031, 1038 (7th Cir. 2006), *overruled on other grounds by Hill v. Tangherlini*, 724 F.3d 965 (7th Cir. 2013).

## DISCUSSION

### I.    Preliminary Issues

#### A.    Local Rule 56.1

Defendant complains that LeBoy has produced, in response to its Local Rule 56.1 statement of material facts, a "supplemental response" that introduces additional facts to substantiate that dispute, as well as filing an entirely separate statement of facts, thereby allowing her to submit more than the 40 facts permitted by Local Rule 56.1(b)(3)(C).   (Def.'s Reply Br. [58], at 2–3.)   The Seventh Circuit has held, in considering Local Rule 56.1's nearly-identical predecessor, that inserting additional facts in responses is inappropriate.  *McGuire v. United Parcel Serv.*, 152 F.3d 673, 675 (7th Cir. 1998).   The court will nevertheless exercise its discretion to consider these facts.  *See Gray v. Hardy*, 826 F.3d 1000, 1004–05 (7th Cir. 2016) (court may choose to consider factual submissions that do not conform to Rule 56.1).

#### B.    Failure to Exhaust Administrative Remedies

Defendant maintains that LeBoy abandoned many of her previous claims with the EEO and therefore cannot re-assert those allegations now.   Under Title VII, federal employees must exhaust their administrative remedies before filing suit in federal court, which requires filing a timely complaint with the EEOC after contacting an EEO counselor.  *Reynolds v. Tangherlini*, 737 F.3d 1093, 1099 (7th Cir. 2013).   LeBoy did not file a formal complaint about any of the conduct she complains of in this case until after her termination, well outside the 45-day period for most of the events she raises here.    But earlier conduct, even if not independently actionable, may still shed light on an employer's true motivation in firing an employee. *Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618, 631 n.3 (2007), *overturned on other grounds by* 42 U.S.C. § 2000e–5(e).   As the ALJ did in her EEOC hearing, the court will

consider the facts described by LeBoy as relevant evidence of Johnson's and Naranjo's intentions in firing her.

For LeBoy's hostile work environment claim, all of the events can be considered in determining whether a hostile environment existed. A hostile work environment claim is timely as long as "*any* act falls within the statutory time period," even if the charge includes events occurring before the statutory cut-off. *Adams v. City of Indianapolis*, 742 F.3d 720, 730 (7th Cir. 2014) (quoting *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 120 (2002)). Defendant has not foreclosed the possibility that some acts fell within the statutory time period. LeBoy requested an appointment for Pre-Complaint Counseling on March 7, 2006, and part of her hostile work environment claim is that she was punished for minor infractions because of her sex and perceived mental disability. The two incidents that were referenced in the February 7, 2006 Notice of Removal occurred on January 21, 2006, and January 24, 2006, within 45 days of LeBoy's contact with the EEO Counselor.

USPS argues that LeBoy's initial request for counseling did not specify that she experienced a hostile work environment. Her formal complaint did, however, assert that she was subject to a "pattern of ongoing harassment/false accusations based on sex and perceived mental disability." (EEO Complaint of Discrimination in the Postal Service (May 17, 2006), Ex. JJ to Pl.'s SOF [56 at p. 12].) The court concludes that hostile work environment claims were well within the scope of claims "brought to the EEOC's attention," and will therefore address them. *See Reynolds*, 737 F.3d at 1100 (quoting *Rush v. McDonald's Corp.*, 966 F.2d 1104, 1112 (7th Cir. 1992)) (internal brackets removed).

## II.    Disparate Treatment

Title VII prohibits employers from discriminating in their employment decisions based on "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a). As recently clarified by

the Seventh Circuit in *Ortiz v. Werner Enterprises, Inc.*, the central inquiry is "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." 834 F.3d 760, 765 (7th Cir. 2016). Proof of intentional discrimination "is not limited to near-admissions by the employer that its decisions were based on a proscribed criterion." *Luks v. Baxter Healthcare Corp.,* 467 F.3d 1049, 1052 (7th Cir. 2006). LeBoy can also establish proof of discrimination through circumstantial evidence, "which suggests discrimination albeit through a longer chain of inferences." *Id.* "In adjudicating a summary judgment motion, the question remains: has the non-moving party produced sufficient evidence to support a jury verdict of intentional discrimination?" *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017).

LeBoy argues that Hurter, Johnson, and Naranjo made explicitly discriminatory remarks. Though not independently actionable, the remarks can be weighed in considering whether the decision to terminate her was itself a manifestation of discriminatory intent. LeBoy also invokes the *McDonnell Douglas* burden-shifting framework, which remains a vital method of proof after *Ortiz*.[18] Under that framework, LeBoy "has the initial burden of establishing that '(1) she is a member of a protected class, (2) she performed reasonably on the job in accord with her employer['s] legitimate expectations, (3) despite her reasonable performance, she was subjected to an adverse employment action, and (4) similarly situated employees outside of her protected class were treated more favorably by the employer.'" *David*, 846 F.3d at 225 (quoting *Andrews v. CBOCS West, Inc.*, 743 F.3d 230, 234 (7th Cir. 2014)). If LeBoy satisfies that

---

[18] *Ortiz* did not purport to disrupt "*McDonnell Douglas* or any other burden-shifting framework," instead, the court simply did away with the "proposition that evidence must be sorted into different piles, labeled 'direct' and 'indirect.'" *Ortiz*, 834 F.3d at 766. Indeed, the framework is employed by the opinion in *David*, which post-dates *Ortiz*. *See David*, 846 F.3d 216 (decided Jan. 13, 2017).

requirement, the burden shifts to USPS to "articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual." *Id.* (quoting *Andrews*, 743 F.3d at 234).

Defendant claims that LeBoy cannot show she was meeting legitimate expectations or was treated less favorably than similarly-situated male employees. LeBoy's disciplinary history shows she was not meeting her employer's expectations, Defendant contends. But, as in this case, "where the issue is whether the plaintiff was singled out for discipline based on a prohibited factor, it 'makes little sense . . . to discuss whether she was meeting her employer's reasonable expectations.'" *Curry v. Menard, Inc.*, 270 F.3d 473, 477–78 (7th Cir. 2001) (citing *Flores v. Preferred Tech. Grp.*, 182 F.3d 512, 515 (7th Cir. 1999)). LeBoy admits she violated rules and, at times, did not follow instructions. But she also claims that Hurter, Johnson, and Naranjo disciplined her disproportionately to her infractions because of her status. There is an ample dispute of fact as to whether the discipline LeBoy's supervisors doled out was consistently proportionate, given that the DRT downgraded four of five Notices of Removal and that, in LeBoy's characterization of the events, the supervisors themselves were often the aggressors.

Defendant also argues that LeBoy has not identified any similarly-situated male employees who were treated more favorably. Whether employees are "similarly situated" is a "flexible, common-sense, and factual" inquiry. *Coleman v. Donahoe*, 667 F.3d 835, 841 (7th Cir. 2012). In general, a plaintiff who believes another individual is similarly situated must at least show that the comparator "(1) dealt with the same supervisor, (2) w[as] subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish [her] conduct or the employer's treatment of [her]." *Orton-Bell v. Indiana*, 759 F.3d 768, 777 (7th Cir. 2014) (internal quotations and citations omitted).

LeBoy points to three male carriers, Morgan, Tamez, and Swierkosz, who were disciplined for similar or more severe offenses but were retained. Though the comparators did not have the same direct supervisor, they did share the same "concurring official[s]," Michael Naranjo and Fred Johnson. Johnson and Naranjo were the officials responsible for LeBoy's termination. Contrary to Defendant's argument, the court concludes that the misconduct ont he part of the three male carriers was comparably severe: Morgan falsified a disability claim and lied to supervisors in an investigation, Tamez was caught driving his vehicle the wrong way down a one-way street and driving with his door open while talking on a cell phone, and Swierkosz scanned mail as delivered when he was parked well away from the delivery locations. Despite this significant misconduct, none of these men were fired. Considered in conjunction with her supervisor's comments, Defendant has not foreclosed an issue of material fact as to whether LeBoy's firing was motivated by discrimination.

The court recognizes that the EEOC dismissed LeBoy's claim, but district courts review Title VII cases *de novo*. *Smith v. Potter*, 445 F.3d 1000, 1001 (7th Cir. 2006), *overruled on other grounds by Hill v. Tangherlini*, 724 F.3d 965 (7th Cir. 2013). The court finds that there are sufficient disputes of material fact in the record, and summary judgment must be denied.

LeBoy did not, however, establish a *prima facie* case that her firing was due to a perceived mental disability. The only allegations in the record related to her perceived mental disability are that Hurter's nickname for her, "Coco," gradually transformed into "Coo Coo," and that he called her "crazy," "whacked," and "nuts" (Pl.'s SOF ¶¶ 4, 19); and that Cullerton, the former Postmaster at the Palatine facility, sent her information on verifying a "mental or nervous condition." (Pl.'s SOF ¶ 25.) The court will assume these comments show that Hurter and Cullerton perceived LeBoy as suffering from a mental disability, but neither of them participated in the decision to terminate LeBoy, nor has LeBoy offered evidence that either of them had input

into that decision.  There is no genuine dispute of material fact about whether LeBoy's firing was caused by Defendant's discrimination against her perceived disability; summary judgment is granted on this claim.

## III.  Hostile Work Environment

LeBoy also claims she was subject to a hostile work environment based on her sex and perceived mental disability.  To prove that she was subject to a hostile work environment, LeBoy must establish at trial that "(1) the work environment was both objectively and subjectively offensive; (2) the harassment was based on membership in a protected class or in retaliation for protected behavior; (3) the conduct was severe or pervasive; and (4) there is a basis for employer liability."  *Boss v. Castro*, 816 F.3d 910, 920 (7th Cir. 2016).  In determining whether a work environment is objectively hostile, courts consider the "frequency of improper conduct, its severity, whether it is physically threatening or humiliating (as opposed to a mere offensive utterance), and whether it unreasonably interferes with the employee's work performance."  *Id.* (citing *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 982 (7th Cir. 2014)).

LeBoy has produced sufficient facts to create a material dispute as to whether she was subjected to a hostile work environment based on sex.  Hurter made taunts concerning LeBoy's menstrual cycle after LeBoy stated she could not come to work because her pelvic muscle injury was aggravated by it.  Other employees saw and heard Hurter mocking LeBoy by saying that she called in sick due to her menstrual cycle and by grabbing his crotch.  In the light most favorable to LeBoy, Johnson's use of the word "Lady" was derogatory, and Naranjo made sexist comments to other employees.  Defendant argues that such comments, many of them made outside LeBoy's presence, should not preclude summary judgment.  *Smith v. Ne. Ill. Univ.*, 388 F.3d 559, 567 (7th Cir. 2004) (affirming summary judgment, finding that racial epithets did not create hostile work environment when plaintiff never heard them, except for one occasion);

*Whittaker v. Ne. Ill. Univ.*, 424 F.3d 640, 645 (7th Cir. 2005) (affirming summary judgment; derogatory references to plaintiff's sex did not create hostile work environment where made outside of her presence and she did not learn of them while employed at defendant employer). But Johnson's comments were directed at LeBoy, and Hurter's comments regarding her menstrual cycle were reported to her by her co-workers immediately, even if they were not directed at her personally. Because she was made immediately aware of them, the comments objectively contributed to a hostile work environment.

Defendant also contends that the harassment was not severe enough, analogizing to *Silk v. City of Chicago*, 194 F.3d 788 (7th Cir. 1999). There, a Chicago police officer alleged that the City was responsible for a hostile work environment based on his disability, sleep apnea, for which he had been given day shifts as an accommodation. *Id.* at 794–95. Plaintiff Silk claimed that other officers were openly hostile to him because he had been awarded the day shift, calling him a "medical abuser" and threatening physical violence with comments like "It won't take much to have me knock you on your [vulgarity] right now." *Id.* at 796 (brackets in original). He also claimed that supervising officers lowered his performance ratings, took away earned days of leave, and forced him to quit his job as an adjunct professor. *Id.* at 796–97. The district court granted summary judgment in favor of the City, primarily because Silk had failed to report most of these claims to any higher officer. *Id.* at 797.

The Seventh Circuit affirmed. *Id.* at 808. The court explained that "in discrimination cases, the 'whole can be greater than the sum of the parts,' and that it is quite appropriate for a plaintiff to 'ask the trier of fact to draw an inference of discrimination from a pattern of behavior when each individual act might have an innocent explanation.'" *Id.* at 807 (quoting *Vande Zande v. Wis. Dep't of Admin.*, 44 F.3d 538, 546 (7th Cir. 1995)). Nevertheless, the court concluded that Silk had failed to demonstrate that the department was "permeated with

discriminatory conduct—ridicule, intimidation, insult—that was sufficiently severe or pervasive to alter the conditions of his employment," especially because he "failed to show any superior officer knew of the harassment he alleges," and the one time he did complain, the sergeant in charge took appropriate action by instructing the abusive officer to stay away from Silk. *See id.* at 808.

Here, there is a genuine issue of material fact as to whether LeBoy suffered a hostile work environment based on her sex. This decision, too, is contrary to that reached by the ALJ, who determined that the conduct LeBoy experienced was not severe or pervasive enough to constitute a hostile work environment. For the purposes of summary judgment, the court disagrees. LeBoy claims that the harassment she experienced came from supervisors, Hurter and Johnson, and that her firing was motivated by the Naranjo's sexism, who was the acting Postmaster at the Palatine facility. To the court's knowledge, there were no other superior officers that she could turn to, nor has the Defendant identified this as a defect in LeBoy's claim. LeBoy has identified overtly sexist comments made by Hurter and Naranjo, and details a string of adverse actions that she claims stemmed from the animosity of the entire supervisory chain above her: Johnson refused to authorize payments due to her for the time she was injured, Johnson and Naranjo disciplined LeBoy numerous times during her short time with the Postal Service, and they ultimately fired her. Taking the facts in the light most favorable to LeBoy, summary judgment is not appropriate on LeBoy's hostile work environment claim based on sex.

A jury could also find that LeBoy was subjected to a hostile work environment based on perceived mental disability. LeBoy alleged that Hurter called her "Coo Coo," described her as "nuts," "whacked" and "crazy," and asked if she had Attention Deficit Disorder or some "mental issue." (Pl.'s SOF ¶¶ 4, 19–20, 26.) There is a genuine dispute as to whether these frequent, demeaning comments were sufficiently pervasive to alter the conditions of LeBoy's employment.

USPS has not foreclosed—nor did it contest in its briefs—the possibility that it was liable for Hurter's actions, as Hurter was a USPS supervisor.  *Cf. Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 848 (7th Cir. 2008) (in Title VII context, employer liability satisfied if a supervisor is responsible for hostile work environment).  Defendant's motion is denied as to LeBoy's hostile work environment claims.

## IV.    Retaliation

LeBoy argues that she has submitted sufficient evidence for a retaliation claim, based on the various disciplinary actions taken against her, to go to a jury.  There is no retaliation claim in her complaint, however.  (*See generally* Am. Compl.)  Even if the court granted leave to amend, a plaintiff must demonstrate that the supervisors knew of the plaintiff's protected activity and must identify a causal connection between the complaints and the retaliation.  *Boston v. U.S. Steel Corp.*, 816 F.3d 455, 464 (7th Cir. 2016).  LeBoy had identified no evidence in the record to show that her supervisors were aware of her complaints to the EEO counselors before her final complaint.  (*See* Pl.'s Resp. Br. [50], at 6–7.)  The final complaint, of course, was after the adverse employment actions had concluded in her firing, and cannot be a basis for retaliation.

## CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment [46] is granted in part and denied in part.  Summary judgment is granted as to LeBoy's claim that Defendant took adverse employment actions against her because of a perceived mental disability, and on her retaliation claims.  Summary judgment is otherwise denied.

ENTER:

Dated: July 5, 2017

_____
REBECCA R. PALLMEYER
United States District Judge

26